**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| Raven Renee Ray, | ) | |
| | ) | |
| Plaintiff, | ) | No.: 2:16-cv-1752-DCN |
| | ) | |
| v. | ) | **FINDINGS OF FACT AND** |
| | ) | **CONCLUSIONS OF LAW** |
| Steve A. Lesniak, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff Raven Renee Ray ("Ray") brought this admiralty action against Defendant Steve A. Lesniak ("Lesniak") pursuant to Federal Rule of Civil Procedure 9(h). Ray is suing Lesniak for personal injuries and other damages she sustained as a result of being struck by the main sheet during a sailing race on Lesniak's boat "the Celadon."

The court tried this case without a jury on September 18, 2017. Having considered the testimony and the exhibits admitted at trial, as well as the parties' pre-trial briefs and post-trial proposed findings and conclusions, the court now makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a). It finds that Lesniak was negligent in his captaining of the Celadon, that Ray suffered an injury while an invited guest on the Celadon as a result of Lesniak's negligence, and that as a result of this injury Ray has a permanent traumatic brain injury. It awards $958,758.15 in damages. This award, in the court's eyes, gives Ray what she deserves—"just some justice, some recognition and help." Tr. 135:24.

# <u>FINDINGS OF FACT</u>[1]

1.  At the time of the incident at issue, Ray was a 29-year-old female working two jobs in the food and beverage industry, volunteering at an acupuncture clinic, and simultaneously pursuing advanced degrees in psychology and clinical counseling at The Citadel.  Ray had never been on a sailboat before the day of the incident.

2.  At the time of the incident, 57-year-old Lesniak was the owner, operator, and captain of the sailboat Celadon on which the incident occurred. Lesniak is an experienced captain, who has 35 years of sailing experience—including 25 years of sailing experience in Charleston.  Tr. 205:15–17.  He has captained "several hundred, maybe a thousand" sailboat races.  Tr. 205:18–20.  He has been sailing with some of the crew members that were on the Celadon at the time of the incident for "15, 20 years."  Tr. 205:24–206:7.

3.  The sailboat Celadon on which the incident occurred is a fifty-one foot, 1995 Beneteau Oceanis 510 registered in Charleston County, South Carolina. At the time of the incident, Lesniak had owned and operated the Celadon for approximately fifteen years.

4.  Operation of the sailboat during a race requires several crewmembers. Thirteen crewmembers and a number of guests were aboard the sailboat on the day of the incident.  Tr. 182:1–183:1.

---

[1] These findings are based on the preponderance of the evidence presented to the court.

## A.  The Accident:

1. The court now turns to the day of the incident, May 21, 2014.  Ray was invited to
   a sailboat race by Colin Skinner ("Skinner"), who Ray knew as a "regular"
   customer at the Oak Bar Tavern where she worked.  Tr. 106:14–20.  Skinner was
   a crew member on the Celadon.  Tr. 184:3–6.  Skinner has been sailing with
   Lesniak for "[r]oughly five years."  Tr. 206:20–22.  Lesniak allowed Skinner to
   invite a guest on the boat.  Tr. 184:5–6.

2. The other crew members who were on the Celadon during the incident had years
   of sailing experience, many as crew members with Lesniak.  Tr. 206:10–208:4.
   Of the crew members on the boat at the time of the incident, at least three had
   medical backgrounds, ranging from Emergency Room nurse to thoracic surgeon.
   Tr. 206:10–208:9.  Lesniak testified that these crew members had previously
   taken action if anyone suffered an injury on the boat during sailing races and trips.
   Tr. 209:21–210:5.

3. Lesniak testified that all of his crew members "[knew] to look after new people."
   Tr. 208:18–21.

4. Lesniak authorized crew members to perform tasks during the race, including
   telling guests when and where to move during the course of the race.  Tr. 209:1–
   20.

5. Ray and Skinner arrived at the Carolina Yacht Club, the marina where the yacht
   was docked.  Tr. 107:7–12.  When she got to the boat, there were "many" people
   on the boat, including crew members and guests.  Tr. 108:1–4.  Ray testified that
   she did not know anyone on the boat other than Skinner.  Tr. 108:5–6.

3

6. Before May 21st, 2014, Ray had never been on a sailboat. Tr. 106:21–107:1. She knew nothing about how a sailboat worked. Tr. 107:2–4.

7. Lesniak did not give safety instructions to any of the guests, including Ray, who was on the Celadon. Tr. 184:12–17. He also did not give any written instructions to guests. Tr. 187:2–6. Furthermore, he did not have a written safety checklist or conduct a safety and operational briefing before the Celadon left the marina. Tr. 187:16–21. At the time of the incident, there were no safety placards or visual displays on the Celadon stating that there were dangerous places to sit on the boat, such as "around any rope, boom." Tr. 186:20–187:1. Lesniak delegated the giving of safety instructions to two crew members, neither of whom testified during the trial. Tr. 14:16–185:6. Lesniak did not hear what safety talks were given to guests because he was at the helm of the boat. Tr. 185:5–9.

8. Ray was late to the start of the boat race and was given an abbreviated version of the "safety talk" by crew members, which involved an instruction on where not to sit on the boat. Tr. 192:10–18.

9. Upon arriving on the Celadon, Skinner placed Ray at the position where she was sitting when the main sheet hit her. Tr. 264:8–265:19. Ray was seated on the deck of the Celadon, near the main sheet. Ex. 13.

10. The crew was aware of where Ray was sitting. Tr. 204:4–6.

11. Within 5–10 minutes of Ray stepping on board the Celadon, the incident occurred. Tr. 194:2–5.

12. Before she was hit, Ray was given instructions by crew members to "get more neighborly, get closer together." Tr. 114:2–3. Specifically, crew member Dawn

Truog ("Truog") asked Ray, who was sitting in front of the main sheet, to "move back from the [main] sheet." Tr. 250:16–25. There was no evidence presented that Ray knew what a "main sheet" was. Crew member Mary Anne Becker ("Becker") also testified, stating that she "told [Ray] specifically to move, move up front, move forward" multiple times, because Ray "was going to be brushed by the sheets" when the boat gybed. Tr. 257:6–12. Becker further testified that even after these verbal warnings to move, Ray "didn't move," and "the next thing" Becker knew was Ray "down on the gutter" of the boat. Tr. 257:17–20.

13. Lesniak made the decision to gybe, which is the action that caused the main sheet to strike Ray. Tr. 199:16–17. When the captain executes a gybe maneuver, as Lesniak did here, the main sheet moves across the deck of the boat. Tr. 221:14–25.

14. Lesniak testified that members of his crew told Ray to move "several times" and that the crew members were aware that she did not move—even after Lesniak had called for the gybe maneuver. Tr. 213:22–214:5. For example, Truog was aware that Ray was sitting in front of the main sheet when Lesniak gybed. Tr. 254:25–255:3. Truog saw "the boom [come] over, and that [Ray] was pushed down to the side of the boat." Tr. 251:9–18.

15. If Lesniak had waited to gybe or made sure that Ray was in a safe location, Ray would not have been hit by the main sheet. Tr. 202:9–13.

16. After Lesniak did the gybe maneuver, Ray was hit by the main sheet, the force of which threw her from her seated position onto the deck of the boat. Tr. 115:14–20. The main sheet carries a significant amount of pressure, "absolutely" enough

to cause a serious injury.  Tr. 237:6–25.  Lesniak saw the main sheet strike Ray.
Tr. 198:25–199:6.

17. The court considered the testimony of various crew members who were on the
Celadon during the incident.  For example, Dr. Bill Lynch testified about the main
sheet hitting Ray.  Additionally, he testified that he did not give any safety
instructions to Ray, and was not aware of any sailing experience that she had.  Tr.
247:1–6.

18. Ray was left with an abrasion on her forehead as a result of the main sheet hitting
her.  Pl.'s Ex. 2.

19. After Ray was injured, Lesniak did not turn the boat around.  Tr. 117:5–12.
Lesniak continued with the boat race.  Tr. 148:10–18.

**B.  Breach of Safety Protocol:**

1. Ray testified about the instructions she was given when she got on the Celadon.
Specifically, Ray stated that she was "told where the lines were" and where to sit.
Tr. 109:18–23.  She was given these instructions and told where to sit by a crew
member, "Peggy."  Tr. 110:6–9.  She was not warned that she "might get hit in
the head with a boom or a rope or anything like that."  Tr. 110:10–17.  There were
also no written instructions on the "hull or deck of the boat or bow or the stern,
starboard side" that said where to sit, and no one gave written instructions to Ray
when she was on the boat.  Tr. 110:18–24.  There was also no formal verbal
safety briefing.  Tr. 111:4–7.

2. Ray did not hear, and "wouldn't have understood" any instructions on whether the boom or main sheet were going to swing during the course of the race. Tr. 115:1–4.

3. The court also credits the testimony of Ray's expert Captain Ken Wahl ("Wahl"), who the court qualified as a boating expert and marine safety consultant. Tr. 214:20–215:9. Wahl opined that competitive sailboat racing "requires a large number of experienced crew to adequately handle the fast-paced activities normally observed during this often dangerous and close quarters style of competitive sailing." Ex. 1 at 8. Wahl further opined that "[o]nly highly experienced persons should be aboard for these events." Id. Based on his review of the evidence, Wahl testified that "there appeared to be a lot of people" on the Celadon, and that "safe places . . . were probably a little bit difficult to find." Tr. 220:1–9.

4. Wahl opined that Lesniak, who had captained hundreds of races, became "complacent" by delegating the "safety orientation" for guests to crew members. Tr. 225:9–226:3.

5. Wahl testified that when a boat race begins, "[t]here's some very dangerous places to be on board the boat . . . [a]nd it's certainly not a safe place to be right near the main sheet." Tr. 221:10–13. Accordingly, Ray, who was seated on the deck of the boat near the main sheet, was in a dangerous position. Tr. 222:1–6.

6. Specifically, Wahl opined that "[m]oving isn't quite enough" "when somebody doesn't know anything about a sailboat, because they don't know where to move to." Tr. 223:23–25. The proper procedure for a crew member to ensure that Ray

was moved safely to another area of the boat was for Lesniak or a crew member to physically ensure that she had been moved to a safer place. Tr. 226:14–227:16. Simply telling a novice passenger like Ray who had never been on a sailboat to move was insufficient, and a breach of safety protocol. Tr. 227:9–21.

7. Wahl further opined that it was in contravention of boat safety protocol for Lesniak to gybe while Ray was sitting next to the main sheet, as gybing the boat necessarily causes a movement of the main sheet. Tr. 223:14–19. Wahl offered suggestions on what safety protocol Lesniak should have followed in that scenario, such as "[d]elay the gybe, get somebody to move that person, tell them where to sit, where the safe spot is." Tr. 223:16–22. Lesniak did none of these things.

8. When a captain changes the position of the sails, such as the gybe maneuver that Lesniak performed, Wahl testified that the captain "typically" will call out to the crew and let the crew members know that he will be changing the position of the sails. Tr. 238:16–239:4.

## C.  Comparative Negligence:

1. Ray was told to move away from the main sheet by multiple crew members, including Truog and Becker, but did not move. Tr. 257:17–20.

2. After getting hit by the main sheet, Ray did not ask anyone for medical attention and did not appear to be in need of any medical attention. Tr. 210:6–23.

3. When Ray got off the Celadon at the conclusion of the race, Lesniak asked her if she was "okay" and she replied that "she was fine." Tr. 210:24–25.

4. A few days after the incident, Lesniak contacted Ray to give her the option of going to see Bill Lynch, a crew member on the Celadon during the incident and a doctor, at no cost.  Tr. 210:1–5.  Ray declined.  Tr. 210:1–5.

**D.  Causation of Traumatic Brain Injury:**

1. Two days after the incident, Ray went to Nason Medical Center because she was experiencing "extreme body pain."  Tr. 119:17–24.  Within seven days of the incident, Ray began experiencing different symptoms—namely, debilitating nausea and headaches.  Tr. 120:11–21.  Ray was "extremely" confused when she went to the Medical University of South Carolina ("MUSC") the week after the incident as a result of her new symptoms.  Tr. 121:1–6.  At MUSC, Ray was referred to a neurologist who diagnosed Ray with a concussion and prescribed medications for a head injury.  Tr. 121:7–25.

2. The only medical expert who testified during the trial was Dr. Marshall Allen White ("Dr. White"), a board-certified neurologist.[2]  Tr. 8:15–16.  Dr. White treats patients with traumatic brain injuries as part of his practice on "nearly a

---

[2] Lesniak objects to allowing Dr. White to testify on the subject of future treatment. However, Ray disclosed Dr. White as one of her treating physicians and produced Dr. White's medical evaluation of Ray, wherein Dr. White opined that Ray had sustained a permanent traumatic brain injury.  The court is convinced that Dr. White's written report and opinion of Ray's permanent injury gave Lesniak adequate notice that Ray would need continued medical evaluation and treatment for her condition for the rest of her life.  Ray disclosed Dr. White as an expert in neurological medicine and pain management in compliance with all relevant expert disclosure requirements and deadlines.  Lesniak made the decision to decline to take Dr. White's deposition, offer his own medical expert disputing the diagnosis of traumatic brain injury or offer an alternative future treatment plan, or to request any additional information from Dr. White regarding his evaluation of Ray.  At the very least, Lesniak was on notice that as a result of the incident, Ray had already spent a significant amount of money on medical treatment including $2,255.70 on medication alone.  Certainly, Ray's medical bills were turned over during discovery. Therefore, the court overrules Lesniak's objection.

daily basis," and has done so since 1991. Dr. White has testified in the past as to

both the diagnoses and causation of traumatic brain injuries. The court credits Dr.

White as an expert in the field of traumatic brain injuries. Tr. 9:21–10:17. Dr.

White examined Ray, and reviewed the following medical records: (1) Nason

Medical Center; (2) MUSC; (3) Dr. Jeffrey Buncher, a pain management

physician in Charleston, South Carolina; (4) physical therapy records; (5)

acupuncture records; (6) neuropsychological testing performed by Dr. Randolph

Waid; and (7) psychiatric records from Dr. Kurtzman. Tr. 11:1–21. Dr. White

testified that, based on his examination of Ray, a review of her medical records,

and consulting with peer-reviewed articles, Ray sustained a traumatic brain injury.

Tr. 12:5–12. Specifically, Dr. White testified that Ray had the symptoms of a

concussion immediately following the incident, in that she was "dazed,

confused," and the morning after the event she felt "that she was not going to be

able to wake up," which Dr. White testified indicated "a level of

hypersomnolence, which is typical following a concussion." Tr. 12:17–13:1. Dr.

White further testified that compared to "baseline records" that were "pretty close

in proximity" to the incident, he observed that Ray had "heightened levels of

anxiety, trepidation, moodiness, difficulty sleeping after the period of

hypersomnolence, difficulty focusing, poor memory, and anxiety levels which

were dramatically increased from her baseline levels." Tr. 13:2–10. All of these

symptoms of traumatic brain injury, according to Dr. White, were caused by the

head trauma that Ray suffered during the incident. Tr. 13:11–15.

3.  According to Dr. White, Ray's traumatic brain injury is "permanent."  Tr. 13:16–

18.  All three of these opinions—that Ray had a traumatic brain injury, that the

brain injury was permanent, and that the brain injury was the result of the incident

on the Celadon—Dr. White testified that he held to a "reasonable degree of

medical certainty."  Tr. 13:19–22.  Specifically, in his report, Dr. White states

that:

> It is my opinion to a reasonable degree of medical certainty that Ms.
> Ray experienced traumatic brain injury as a result of her sailing
> incident, which occurred in 2014.  There is ample evidence of
> headache, nausea, vomiting, and worsening in her neuropsychiatric
> syndrome and cognitive abilities following the incident . . . It is
> further my opinion that Ms. Ray would clearly have academic,
> social and occupational difficulties throughout every facet of her
> life.

Pl.'s Ex. 4.  Dr. White further testified that when he examined Ray, she was

having emotional and concentration issues that he attributed to her "residual

[traumatic brain injury] symptomology," and that this was consistent with a

patient with her level of brain injury.  Tr. 28:13–23.

4.  Dr. White also testified at length about Ray's post-incident treatment in the week

after the incident, based on his review of her medical records.  At Nason, Dr.

White testified that no diagnostic testing was performed, and instead Nason

"basically gave her pain medicine and sent her home."  Tr. 17:9–11.  Then, Ray

went to the MUSC emergency room, where she was "evaluated and treated" for

"neck and back pain."  Tr. 17:14–15.  Ray then returned to MUSC with

"complaints of pain," and returned once again within five days of the injury

"complaining of headaches" as well as nausea and vomiting.  Tr. 17:19–23.

These symptoms of headaches, nausea, and vomiting, were, Dr. White testified,

symptoms of a concussion. Tr. 18:11–14. Based on his review of Ray's medical records and after taking her medical history, Dr. White concluded that Ray had "a lot" of the symptoms of the postconcussive syndrome. Tr. 20:5–9.

5. Lesniak argued at various points during the bench trial that Ray did not immediately experience any symptoms of headaches, nausea, and vomiting while on the Celadon or the next day. However, Dr. White testified that there can be "delayed effects from concussion." Tr. 35:24. Furthermore, Ray had consumed at least one beer immediately before the incident. Alcohol consumption, Dr. White testified, would impair Ray's ability to recognize her symptoms. Tr. 36:6–11.

6. Dr. White testified that postconcussive headaches such as the ones that Ray experienced can be developed "within seven days of the concussion itself." Tr. 18:22–24. Indeed, Dr. White testified on the types of symptoms during the "days and weeks" after a concussion, and stated that there can be "difficulty concentrating, moodiness, hypersomnolence . . . [a]nxiety . . . headaches, nausea, and vomiting." Tr. 19:1–17.

7. Ray had a CT scan done at MUSC, which had normal results, but Dr. White testified that the normal CT scan did not disturb his opinion that Ray had a traumatic brain injury, as mild traumatic brain injury patients will have "under almost all circumstances . . . normal imaging." Tr. 21:18–22:2. Indeed, Dr. White testified that a normal CT scan was "expected" for patients with mild traumatic brain injury. Tr. 22:3–6.

8. The court considered that Ray was not diagnosed with traumatic brain injury, or indeed any injury at all, by any emergency room physicians in her visits to Nason or the MUSC ER. But, according to Dr. White, the peer-reviewed literature in the field is clear that mild traumatic brain injuries "can be overlooked," even by emergency room physicians. Tr. 36:2–5. Furthermore, in none of the medical visits that Ray had in the immediate aftermath of the incident did she have any cognitive testing done that would have detected such cases of traumatic brain injury. Tr. 52:11–60:4.

9. Dr. Kurtzman, a psychiatrist who examined Ray on May 1st before the incident, indicated that Ray was working on her graduate thesis and had no "uncontrolled anxiety or crying spells." This psychiatric record is closest in proximity to the incident. Tr. 14:13–15:11. Dr. Kurtzman's psychiatric record further indicates that as of May 1st, Ray was a "student, working doing marketing, volunteering, and doing research—all while supporting herself financially." Tr. 15:12–20. In his treatment notes for Ray after the incident, Dr. Kurtzman stated that Ray had "suffered . . . emotionally and physically from an injury sustained from being hit by a sailboat boom . . . I'm concerned about her emotional prognosis and her emotional upset secondary to the accident." Tr. 23:6–24:4. Dr. Kurtzman also prescribed Ray the medication Adderall, which Dr. White testified is an "amphetamine stimulant" that is "used for patients with [traumatic brain injury] who are having difficulty concentrating." Tr. 24:5–15. Concentration and attention problems such as those treated with Adderall are consistent with the diagnosis of mild traumatic brain injury, Dr. White testified. Tr. 24:16. Dr.

White further testified that during his examination and interview with Ray, she stated that she experienced those symptoms for the first time after the date of the incident. Tr. 24:19–22. Ray testified that she had never been prescribed Adderall or psychostimulants before the incident. Tr. 101:14–102:7. At the direction of her doctor, Ray has been taking Adderall in increasing doses since the incident. Tr. 126:22–11.

10. The court acknowledges that prior to the incident, Ray was on the medication Klonopin to treat anxiety. Tr. 16:2–9. However, Dr. Kurtzman was on a successful program to wean Ray off of Klonopin. Tr. 16:10–16. Ray testified that she was in the process of "taper[ing] off" the anti-anxiety medication. Tr. 102:16–103:4. The court also acknowledges that Ray suffered from general anxiety disorder, which can have symptoms similar to those found in someone with a concussion. Relatedly, the court has considered Ray's testimony about the circumstances of her unfortunate upbringing, including her time in foster care and her intermittent history with prescribed antidepressants and anti-anxiety medication. Tr. 92:1–99:3. The court credits Dr. White's opinion—that the temporal relationship between the incident and the onset of symptoms supports a finding that Ray was not suffering from her historical general anxiety disorder, but from the head trauma she received as a result of the incident. Tr. 48:4–20.

11. Ray was seen by Dr. Woodard, a neurologist at MUSC, "several months" after the incident. Dr. Woodard also diagnosed Ray as having postconcussion syndrome, and placed her on gabapentin and nortriptyline. Nortriptyline is used to treat

headaches, while gabapentin is used to treat headaches, mood disturbances, and sleep. Tr. 20:12–21:14.

12. On July 28, 2015, Ray had neuropsychological testing, which discerns whether there are "cognitive or emotional deficits related to injury" performed by Dr. Randolph Waid. Tr. 25:1–14. Specifically, Dr. Waid employed the Conners Continuous Performance Test II to assess Ray's "attentional abilities." Tr. 25:14–24. Based on Ray's pre-incident level of functioning, Dr. Waid felt that Ray's concentration abilities, which were in the ninth percentile, were low. Tr. 26:2–5. Ray had a "very high GPA" in her college and graduate work before the incident. Tr. 26:11–12. Ray had a 3.7 GPA at the College of Charleston. Tr. 101:5–7. The cause of the decrease in Ray's attention between college and the day that Dr. Waid performed his neurophysical testing was, in Dr. White's opinion, the traumatic brain injury that she suffered as a result of the incident. Tr. 26:15–18.

13. Ray also saw Dr. Jeffrey Buncher for injuries related to the incident. Ray had pain management issues before the incident, specifically with chronic neck and back pain. Ex. 8. But Ray's pain problems with her sacrum were, in Dr. White's opinion, "exacerbated" by the incident. Tr. 27:1–21.

14. Dr. White offered a future treatment plan to treat Ray's permanent condition and opined that "there are a number of interventions that ought to be taken in her care that are currently not being taken" and that Ray was not receiving treatment from any doctors who treated traumatic brain injuries. Tr. 30:1–32:2. Dr. White also testified about the cash prices of the drugs necessary for the future treatment plan. Tr. 32:14–33:15.

15. The court also considered the testimony of Chad Houfek ("Houfek"), an acupuncturist and the owner of Charleston Community Acupuncture. Tr. 81:11–23. Houfek knew Ray as a patient as well as a volunteer at Charleston Community Acupuncture. Tr. 82:2. In her capacity as a volunteer, Ray worked answering phones, scheduling appointments, and also helped with bookkeeping. Tr. 82:11–83:8. Houfek testified about how Ray was different after the incident, from a treatment perspective, explaining that she came in for acupuncture a week after the incident, and that "she had a big mark on her temple, and she was very upset, she was crying and very scared, didn't really know what to do, and she had a lot of neck pain." Tr. 83:9–19. When Ray had her acupuncture appointment on May 28th, approximately one week after the incident, Houfek recorded in his session notes that Ray was "postconcussion," and that what she was experiencing included sensitivity to stimulus and headaches. Tr. 84:9–18. After the incident, Houfek continued to treat Ray, and stated that he was treating her mostly for neck pain and lower back pain, as well as insomnia, and "extreme emotional." Tr. 87:4–9.

16. Houfek also testified about the changes in Ray as a volunteer after the incident. Before the incident, Houfek described Ray as "awesome," as an employee who was "very friendly," who "always showed up on time," and "took initiative." Tr. 85:7–15. But after the incident, Houfek testified that Ray was "always late," "very very scattered," and that "communicating with her was difficult." Tr. 85:17–25. Houfek further testified that he had not experienced any of those problems with Ray before the incident. Tr. 86:2–4.

17. The court has considered the reports and treatments notes of the doctors, including pain management specialists and neurologists, that Ray has seen since the incident. Ex. 10. In conjunction with Dr. White's testimony, these medical documents support the conclusion that Ray suffered a traumatic brain injury as a result of the injury she suffered on the Celadon.

18. Prior to the incident, Ray testified that "[l]ife was great," and that she "was excited for finishing" her master's thesis at the Citadel and continuing on for her Ph.D. Tr. 103:18–25. In addition to being in the master's program at the Citadel, Ray was also working at the restaurant Oak Barrel four nights a week, Tr. 104:19–24, in the tasting room at the restaurant Freehouse two nights a week, Tr. 104:15–105:1. She was also volunteering with Charleston Community Acupuncture and doing research. Tr. 105:17–24. She testified that despite this busy schedule she never had any problems with attention before the incident. Tr. 106:1–11.

19. Since the incident, Ray has had suicidal ideations. Tr. 124:22–125:9. She has also been suffering from giggling issues and other inappropriate responses to stimuli, which never occurred before the incident. Tr. 127:19–25. As a result of these issues, as well as the problems in concentration and attention, her professors at the Citadel have expressed "legitimate concerns" about her ability to complete the graduate program. Tr. 127:19–25; 132:1–9. Furthermore, since the incident Ray has lost her jobs at the Oak Barrel and the Freehouse. Tr. 128:16–19. Ray attributes both of these job losses to the incident. For example, as a result of the injuries she sustained, Ray has had to ask her customers and friends to come and

help her while she was at the bar.  Tr. 129:1–10.  Additionally, when there were stimuli such as music or "certain sounds," Ray would run out of the bar and "leave the entire bar empty, and cry in the alley."  Tr. 129:4–11.  Before the incident, Ray did not have these problems at work.

20. Since the incident, Ray has had physical and psychological problems.  Physically, she has had trouble sleeping, has "nerve pain down the back of her leg," and tension headaches.  Tr. 130:13–131:21.  She now also has communication issues, which have affected her interpersonal, professional, and educational goals.  Tr. 136:21–137:13.

21. The court considered the medical bills that Ray has incurred, between the date of the incident and present.  Pl.'s Ex. 10.  Ray does not have health insurance.  Tr. 123:4–7.  The total medical bills for her injury totaled $20, 480.70.  Pl.'s Ex. 10. By the time of trial, Ray had incurred the following expenses to treat her injuries:

| | | |
|---|---|---|
| a. | Nason Medical Center | $127.00 |
| b. | MUSC | $4,654.00 |
| c. | MUSC Physicians | $1,194.00 |
| d. | Dr. Waid | $1,125.00 |
| e. | Dr. Kurtzman | $2,050.00 |
| f. | Dr. Buncher | $5,945.00 |
| g. | Charleston Community Acunpuncture | $3,130.00 |
| h. | EnterpriseRx | $74.82 |
| i. | Publix Pharmacy | $228.36 |
| j. | Walgreens Pharmacy | $1,952.52 |

Total: $20,480.70

### III.  CONCLUSIONS OF LAW

Based on the testimony of all of Lesniak's crew members and all experts, including Ray's expert Captain Wahl, Lesniak was negligent in doing a gybe maneuver when he and his crew members knew or should have known that Ray was sitting in front of the main sheet which is a dangerous place to sit.  Prior to undertaking the gybe maneuver during the sailboat race, Lesniak had a duty to: (1) properly administer safety briefings to Ray that included where the safe places to sit on the boat were during the race; (2) warn Ray that the gybe maneuver was going to be undertaken; (3) not gybe until Ray was no longer sitting in front of the main sheet; and (4) not hit Ray with the main sheet rope during the gybe maneuver.  A failure to follow safety precautions, including telling Ray where to move and delaying the gybe maneuver until Ray had moved to a safe place, was a breach of Lesniak's duty to Ray.  The court further finds that it was completely foreseeable to Lesniak that Ray could be injured by his failure to warn her that a gybe maneuver was going to be undertaken that would involve moving the main sheet that she was sitting directly in front of, and his failure to prevent the main sheet from hitting Ray.  Lesniak's negligence was a proximate cause of Ray's injuries; but for this breach of duty, Ray's injuries would not have occurred.

However, Lesniak has presented sufficient evidence to support the allegation in his Answer that Ray was comparatively negligent.  Specifically, Ray failed to pay attention to warnings from multiple crew members to move from her position in front of the main sheet rope.  Ray was to blame, in part, for being hit by the main sheet.  The court finds that Ray was 25% to blame, and so reduces her damages by 25%.

As a direct result of Lesniak's failure to exercise the proper degree of skill required, Ray sustained injuries and damages, as discussed below. In making the above findings of fact, reference has been made to pertinent portions of the testimony and exhibits introduced into evidence; however, the court has taken into consideration all of the evidence presented. The court specifically finds the evidence, after considering the appearance, demeanor and qualifications of the witnesses and the testimony as a whole, supports each of its findings by a preponderance of the evidence.

## A.      Jurisdiction and Applicable Law

Federal admiralty jurisdiction exists where, as here, conditions of both (1) location and (2) a connection with maritime activity are satisfied. Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534, (1995). Admiralty jurisdiction extends to injuries involving recreational vessels such as the Celadon. See Oliver by Oliver v. Hardesty, 745 F.2d 317, 320 (4th Cir. 1984) (admiralty jurisdiction exists over a case involving a collision between a swimmer and a pleasure boat because the claim was based on an allegation of negligent navigation of the boat). The portion of the Charleston Harbor where the incident occurred constitutes navigable waters of the United States, and being struck by the main sheet of a racing sailboat has a connection to maritime activity. Accordingly, the court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1333. See Sisson v. Ruby, 497 U.S. 358, 364–65 (1990).

Cases involving a tort committed on navigable waters are governed by federal admiralty law. Byrd v. Byrd, 657 F.2d 615, 617 (4th Cir. 1981) (citation omitted). However, if there is no admiralty rule for a particular issue, the court looks to state law to supply the rule of decision. Id. "This rule is especially true in negligence causes of

action," which is the cause of action that Ray asserts. Schumacher v. Cooper, 850 F. Supp. 438, 447 (D.S.C. 1994) (citation omitted). Therefore, to the extent admiralty law is not directly on point, ordinary negligence law applies.

**B.      Lesniak's Liability**

To establish her claim, Ray must prove that Lesniak's negligent operation of the Celadon harmed her. The elements of negligence are duty, a breach of that duty, proximate cause, and resulting injury. Schumacher, 850 F.Supp. at 447 (internal citations omitted).

**a.      Duty**

It is well-established in general maritime law that a vessel operator has a duty to exercise reasonable care for the safety of his passengers. See Bubla v. Bradshaw, 795 F.2d 349, 353 (4th Cir. 1986) (quoting Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 630 (1959)). Lesniak was the captain, and so was in charge of the vessel at the time of Ray's injury. As such, he was charged with a duty of care to his passengers. This standard of care owed to a passenger by a vessel operator under maritime law is reasonable care under the circumstances at that particular time in each case. Id. "The extent to which circumstances surrounding maritime travel are different than those encountered in daily life and involve more danger to passengers, will determine how high a degree is reasonable in each case." Keefe v. Bahama Cruise Line, Inc., 867 F.2d 1318, 1322 (11th Cir. 1989) (quoting Rainey v. Paquet Cruises, Inc., 709 F.2d 169, 172 (2nd Cir. 1983)). In this case, the circumstances surrounding a sailboat participating in a race in the Charleston harbor call for a heightened degree of care.

Additionally, before stepping on board the Celadon, Ray had never before been on a sailboat, a fact of which Lesniak was unaware of and failed to inquire about.

A vessel operator also "has a duty to maintain a proper lookout by sight and by hearing" while the boat is travelling through navigable waters. Schumacher, 850 F.Supp. at 447. "This duty stems from general concepts of prudent seamanship as well as from the [regulations] governing the navigation of vessels." Id. As a matter of prudent seamanship, "the performance of lookout duty is an inexorable requirement of prudent navigation." Anthony v. Int'l Paper Co., 289 F.2d 574, 580 (4th Cir. 1961). Rule 5 of the Inland Navigation Rules states that "[e]very vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." 33 C.F.R. § 83.05. Rule 5 perpetuates the common-law duty discussed in Anthony. Schumacher, 850 F.Supp. at 448 (citation omitted). It imposes a duty of proper lookout upon the operator of a pleasure craft such as the Celadon. See Todd v. Schneider, 2003 WL 23514560, at *11 (D.S.C. Dec. 8, 2003). Importantly, "[w]hoever is keeping a lookout must be able to give proper attention to that task and should not . . . undertake duties that would interfere with this function." Schumacher, 850 F.Supp. at 448 (citation omitted).

"The duty to maintain a proper look-out, whether regulatory or customary, varies with the circumstances of each situation. When circumstances demand unusual care in navigation, such care should be used." Id. at 449–50 (internal citations omitted). That higher level of care was required here, as Ray was an invited guest aboard a sailboat involved in a race in the Charleston harbor.

Lesniak was the owner, captain, and operator of the sailboat and was in control of its operation at all times. Ray was Lesniak's passenger and guest. Although Lesniak designated his crewmembers to administer safety instructions to the passengers, as captain, Lesniak was ultimately responsible for the safety of the crewmembers and guests. Thus, Lesniak owed Ray a duty to maintain a proper lookout at all times during the Celadon's outing.

### b.      Breach

Ray offered the testimony of Captain Wahl as her liability expert with regard to safe vessel operation. Captain Wahl has extensive knowledge about the safe operation of vessels. He obtained this knowledge from his many years of personally operating vessels, obtaining credentials, holding an array of maritime positions, authoring several books, and teaching well over 18,000 students in the subject. The court finds the testimony of Captain Wahl to be credible. Lesniak offered no liability expert at trial.

Captain Wahl testified that as the captain of the Celadon at the time of the incident, good seamanship practices required Lesniak to have the ultimate responsibility to look out for persons aboard his vessel—even if he delegated some of those responsibilities to crew members. Wahl testified that this ultimate responsibility includes providing adequate instructions, warnings, guidance, or lessons to all passengers, including late arriving ones, regarding the potential dangers of movement and position on his vessel and how to avoid those dangers. He also testified that looking out for passengers aboard a vessel includes refraining from performing a gybe maneuver until ensuring that all of the passengers are seated safely out of the path of the boom and its related parts such as the main sheet. Captain Wahl further testified that, even if a

passenger is told verbally to move from a certain spot before a maneuver is performed, it would be a best practice to physically ensure that the person, especially if that person is a novice passenger with no sailing experience, has been moved to a safer place on the sailboat before proceeding to perform the maneuver. It is also Captain Wahl's opinion that only highly experienced persons should be aboard for racing events, because inexperienced persons may not be able to handle the fast-paced activities normally observed during competitive sailing.

The court finds that Lesniak failed to act as a prudent mariner in failing to: (1) provide adequate posted, written, or verbal warnings to Ray regarding the potential dangers of movement and position on the Celadon and how to avoid those dangers; and (2) in failing to make sure that his passengers were in a safe location at all times, especially before performing a gybe maneuver which causes the boom and its related parts to swing quickly from port to starboard or vice versa. The court finds that these acts and omissions constitute a breach of Rule 5 of the Inland Navigation Rules, the common-law lookout duty, and the general duty of due care under Admiralty and South Carolina law.

### c.      Causation

General tort principles require a plaintiff asserting a negligence claim to show that the defendant's breach of duty proximately caused her injuries. Schumacher, 850 F.Supp. at 451. However, a finding that the defendant breached his duty to maintain a proper lookout imposes upon him the burden of showing by clear and convincing evidence that such failure did not contribute to the accident. Id. This burden shift occurs

regardless of whether the breach is viewed as a violation of Rule 5 or as breach of the common-law lookout duty.  Id.

The court's determination that Lesniak breached his duty to keep a proper lookout imposes upon him the burden to show by clear and convincing evidence that his breach of duty did not contribute to the incident.  The record here does not support such a showing.  Therefore, the court concludes that Lesniak's negligence caused the main sheet to strike Ray's head and, therefore, Ray's resulting injuries.

### d.    Comparative Negligence

Since jurisdiction is premised upon admiralty, federal common law governs.  As such, the doctrine of comparative negligence applies.  See, e.g., Mullenix v. United States, 984 F.2d 101, 104 (4th Cir. 1993) (citing United States v. Reliable Transfer Co., 421 U.S. 397, 407, 411, (1975)).  Thus, in the context of an admiralty case, damages should "[b]e allocated among the parties proportionately to the comparative degree of their fault." Reliable Transfer Co., Inc. 421 U.S. at 411, 95 S.Ct. 1708.

The court finds that Ray's recovery should be reduced because Ray shares in the fault attributable as a result of the incident.  Lesniak is required to prove the elements of duty, breach, causation, and injury as to Ray's alleged negligence. Schumacher, 850 F. Supp. at 452 (citing Wilson v. Marshall, 195 S.E.2d 610, 612 (S.C. 1973)).  Namely, an individual has a "duty to exercise due care for one's own safety."  Id.  The court finds that Ray's conduct contributed to her injuries, and reduces her damages by 25%.

The court finds that Ray was instructed by multiple crew members on multiple occasions on safety protocol, including where to sit.   Ray admits that she was aware of potential dangers on the Celadon, and that she was told to "get closer together" and to

"get more neighborly" in the moments immediately before the main sheet hit her. Lesniak and all four members of his crew who testified at trial indicated that there was a safety protocol, that Becker, an individual with sixty plus years of sailing experience, and her fellow crew member Truog, were delegated the duty of administering safety instructions and watching out for new, inexperienced passengers. Becker and Truog testified at trial that these were duties bestowed by their captain, Lesniak, and that they had a present-day recollection of communicating with Ray directly. The court further finds that Ray did not follow the instructions to move. Thus, Ray failed to take responsibility for herself, a duty which is imposed under the law. However, the court considers Ray's inaction against the backdrop of Captain Wahl's testimony that Ray as a novice passenger would not know what the safe places were on the boat without being physically guided to those places.

## C.      Damages

Substantive admiralty law governs all cases brought under federal admiralty jurisdiction; however, it does not automatically displace state law. Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199 (1996). If there is no admiralty law on point, the court may look to the laws enacted by the state legislature or declared to be law by the state's highest courts. Byrd v. Byrd, 657 F.2d 615, 617 (4th Cir. 1981). Accordingly, the court may look to the law of the State of South Carolina in regard to the award of damages arising out of a negligence cause of action in admiralty. Id.

In a personal injury case such as this, the elements of damages potentially recoverable "include past and future medical expenses, past and future pain and suffering, past and future loss of income and earning power, disfigurement, loss of enjoyment of

life, and loss of family services." Schumacher, 850 F.Supp. at 453 (citing Watson v. Wilkinson Trucking Co., 136 S.E.2d 286, 291 (S.C. 1964)). Mathematical precision in ascertaining damages is not required. Brooks v. United States, 273 F.Supp. 619, 629 (D.S.C. 1967). Instead, the injured party must be awarded damages sufficiently proportionate to the injuries sustained. Drennan v. Southern Railway, 75 S.E. 45 (S.C. 1912).

The evidence in this case reveals Ray has suffered and will suffer such past and future damages, and she is entitled to recover for all of them.

### a.      Past Medical Expenses

Ray seeks to recover certain expenses for her prior medical care. At trial, she submitted a medical bill summary totaling $20,480.70 in prior care. Those expenses are recoverable, as they consist of services such as emergency medical treatment, imaging, physical therapy, psychiatric treatment, and pain management. Those expenses resulted from Lesniak's negligence and were reasonably necessary. See Sossamon v. Nationwide Mut. Ins. Co., 135 S.E.2d 87, 91 (S.C. 1964). Moreover, the court is satisfied that the invoiced amounts are reasonable. See Haselden v. Davis, 579 S.E.2d 293, 295 (S.C. 2003) (citation omitted). Therefore, the court awards Ray $20,480.70 in past medical expenses.

### b.      Future Medical Expenses

Ray seeks damages to cover her anticipated future medical expenses. "[R]ecovery of damages based on future consequences of an injury may be had only if such consequences are reasonably probable or reasonably certain." Lohrmann v. Pittsburgh Corning Corp., 782 F.2d 1156, 1160 (4th Cir. 1986). "Reasonably certain" is "a

consequence 'which follows the original act complained of in the usual, ordinary, and experienced course of events.'" <u>Rabb v. Orkin Exterminating Co.</u>, 677 F.Supp. 424, 426 (D.S.C. 1987) (quoting <u>Ford v. AAA Highway Express, Inc.</u>, 29 S.E.2d 760, 762 (S.C. 1944)). In other words, damages can be recovered only if there is "[a] greater than 50% chance that a future consequence will occur." <u>Lohrmann</u>, 782 F.2d at 1160.

Dr. White, the only medical expert offered in this case, testified at trial that Ray's condition is permanent and will require ongoing future treatment and medication. The court concludes that Ray has established a reasonable certainty that her condition is permanent and will require ongoing future treatment, including seeing a psychiatrist and a neurologist quarterly, and medication, potentially including anti-inflammatories (anti-inflammatory patch), amphetamines or an amphetamine substitute (Nuvigil), a benzodiazepine (Klonopin), a sedative-hypnotic (Belsomra), an anxiolytic (Buspar), and a selective serotonin reuptake inhibitor (Cymbalta). Dr. White testified that Nuvigil costs approximately $800.00 per month, Cymbalta costs approximately $200.00–300.00 per month, and Belsomra costs approximately $400.00–500.00 per month.

Ray's birthday is May 8, 1985. At the time of the incident she was 29 years old. Thus, at the time of the incident, Ray had a life expectancy of 52.53 years, or 630.36 months, under S.C. Code Ann. § 19-1-150.

Adjusted for present value,[3] the future medications, frequency, current cost, duration, and present value are as follows:

---

[3] Lesniak contends that Ray needs an expert economist on the issue of present value of future damages and needed to present evidence at trial on the calculation of present value discounts. However, he cites no caselaw—and the court is aware of none—that there is a requirement of obtaining expert testimony on the issue of present value of future damages. The court can find no clear requirement in relevant federal case law that plaintiff must

| Medication | Frequency | Current Cost | Duration | Present Value |
|---|---|---|---|---|
| Nuvigil | annual | $9,600/yr | 2018–life | $330,345 |
| Cymbalta | annual | $2,400-$3,600/yr | 2018–life | $82,585–$123,870 |
| Belsomra | annual | $4,800-$6,000/yr | 2018–life | $165,170–$206,465 |

Future medication costs are increased at an expected inflation rate for prescription drugs of 3.61 percent, compounded annually.[4]  The present value of the total future medications that Dr. White opined were reasonable and necessary for Ray's treatment ranges in cost from $578,100 (using the low figures of the cost of medicine needed) to $660,689 (using the high figures of the cost of medicine needed).[5]  The court awards the

---

present expert evidence of the present value of her claim for future damages.  The court draws guidance from the Western District of North Carolina's recent opinion in Talley v. City of Charlotte, 2016 WL 1212369, at *2 (W.D.N.C. Feb. 12, 2016), appeal dismissed (Aug. 31, 2016), which observed:

> [t]he courts are split on whether it is necessary to introduce expert testimony to explain the concept of discounting an award to present value or to supply suggested discount and inflation rates and/or mathematical calculations. While some courts have permitted, for example, a local banker to testify as to the fair return on a safe investment, or a mathematician an actuary, or an accountant to testify concerning the procedure by which the reduction to present value should be calculated, other courts have held that expert testimony is permitted but not required, and that the jury should generally be left to its own discretion as to what discount factors should be used.

Here, the court calculated the present value discounts employing a discount rate of five percent to damages for future medical care.  See Faust v. S.C. State Highway Dep't, 527 F. Supp. 1021, 1036 (D.S.C. 1981), rev'd on other grounds, 721 F.2d 934 (4th Cir. 1983) ("I find that he is entitled to be properly compensated for his pain, suffering, damages and permanent partial disability, before and after trial, and taking into consideration future pain and suffering and discomfort, and reducing that amount to its present cash value by use of a discount rate of five (5%) percent, which this court feels is reasonable and fair.").

[4] This rate is based on inflation rates as reported by the Bureau of Labor Statistics for the period 1992–2016.

[5] All future medication costs are discounted to present value at a rate of 5 percent, compounded annually.  This is a rate that an ordinary person with average financial knowledge, with access to commonly available investment outlets, and facing the full range of financial risks might be expected to earn over a long period of time.

average of the cost of medicine needed, and so awards $619,394.50 for future medical expenses associated with her injuries resulting from the May 21, 2014, incident.

### d.      Pain and Suffering

Ray's pain and suffering because of this incident is well documented through her deposition and trial testimony as well as her medical records.  She endured months of frequent headaches, nausea, muscle pain, and back pain as a result of her physical injuries.  Raven Ray seeks $75,000.00 for past and future pain and suffering.  Based on the entire record, the court concludes that $50,000.00 is the appropriate amount of compensation for both past and future pain and suffering.  See Schumacher, 850 F.Supp. at 453.

### e.      Past and Future Emotional Distress

Injured plaintiffs are entitled to recover for mental anguish and permanent emotional scarring.  Steeves v. United States, 294 F. Supp. 446, 458 (D.S.C. 1968). Ray's severe psychological and emotional injuries because of this incident are well-documented by Houfek.  Testimony from Ray and Houfek, in addition to Dr. Kurtzman's and Dr. Waid's records, show the extent and severity of Ray's psychological and emotional injuries proximately caused by Lesniak's negligence.  After a careful review of the entire record, the court finds $75,000.00 for her psychological and emotional injuries reasonable.  Therefore, it awards judgment against Lesniak in the amount of $75,000.00 for Ray's past and future psychological and emotional injuries.

### f.      Loss of Enjoyment of Life and Permanent Impairment

Next, Ray seeks $100,000.00 as compensation for losing her ability to enjoy the athletic and recreational activities in which she used to participate, as well as her loss of enjoyment of other normal activities of life. Based on the entire record, the court concludes that $100,000.00 is the appropriate amount of compensation for this loss.

Additionally, Ray is permanently impaired due to this traumatic brain injury and must be compensated for her permanent impairment. Ray's birthday is May 8, 1985. At the time of the incident, she was 29 years old. Thus, at the time of the incident, Ray had a life expectancy of 52.53 years, or 19,173.45 days, under S.C. Code Ann. § 19-1-150. Finding a valuation of a traumatic brain injury at $20.00 per day to be reasonable, the court awards Ray $383,469.00 for her impairment. In sum, the Court awards Raven Ray $483,469.00 for her loss of enjoyment of life and permanent impairment.

### g.      Lost Wages/Inconvenience and Disruption of Normal Daily Life

At the time of the incident, Ray was working in the food and beverage industry and attending The Citadel to obtain a graduate degree. Because of her injuries resulting from Lesniak's negligence, Ray was forced to miss work and experienced difficulty in completing her graduate coursework at The Citadel. The court finds $30,000.00 to be appropriate compensation for Ray's lost wages and difficulties experienced in completing her graduate coursework at The Citadel. See Schumacher, 850 F.Supp. at 453.

### D.      Prejudgment Interest

Ray asks the court to add prejudgment interest to her damages. In maritime injury cases, "the awarding of prejudgment interest is the rule rather than the exception, and, in practice, is well-nigh automatic." U.S. Fire Ins. Co. v. Allied Towing Corp., 966 F.2d 820, 828 (4th Cir. 1992) (citation omitted). The court may decline to award prejudgment

interest when it finds that "peculiar circumstances" would make such relief inequitable.  Id.  This is an action instituted under the court's admiralty jurisdiction and no peculiar or exceptional circumstances existed that would prevent Ray from recovering pre-judgment interest.  This court, in its discretion, finds no such peculiar circumstances here and finds that Ray is entitled to pre-judgment interest in the amount of $22,952.44 from the date of the accident until the date of this order.

## IV.  CONCLUSION

Based on the foregoing, it is **ORDERED** that judgment be entered for Ray against Lesniak in the sum of nine-hundred and fifty-eight, and seven-hundred and fifty-eight dollars and fifteen cents $958,758.15,[6] plus prejudgment interest in the amount of twenty-two thousand, nine-hundred and fifty-two dollars and forty-four cents $22,952.44, and postjudgment interest at the legal rate from the date of this order.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**February 22, 2018**
**Charleston, South Carolina**

---

[6] The tabulation of damages is $1,278,344.20 before the application of a 25% reduction in proportion to Ray's comparative negligence.  After applying the 25% reduction, the total damages award is $958, 758.15.